# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| EWING COLE, INC., <br> *Plaintiff,* <br><br> v. <br><br> COUNTY OF CUMBERLAND, <br> *Defendants.* | Civil Action No. <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Ewing Cole, Inc. ("EwingCole"), hereby files this Complaint against Defendant, County of Cumberland (the "County"), and in support thereof, avers as follows:

## THE PARTIES

1. EwingCole is a nationally recognized architecture, engineering, interior design and planning firm with offices in seven states.

2. EwingCole maintains its principal office and place of business at 100 North Sixth Street, Philadelphia, PA 19106.

3. EwingCole is incorporated in the Commonwealth of Pennsylvania.

4. At all times material hereto, EwingCole was and is a citizen of the Commonwealth of Pennsylvania and no other state.

5. At all times relevant hereto, EwingCole was authorized to conduct business in the State of North Carolina.

6. The County is a county located in the State of North Carolina and body politic and corporate.

7. The County may be sued, in part, pursuant to N.C. Gen. Stat. § 153A-11.

1

8. At all times material hereto, the County was and is a resident of the State of North Carolina.

**JURISDICTION AND VENUE**

9. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1). There is complete diversity between the Plaintiff, EwingCole, and the Defendant, County of Cumberland, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants reside in this District.

11. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because, as discussed more fully below, a substantial part of the events, acts or omissions giving rise to EwingCole's claims occurred within this District.

12. This Court has personal jurisdiction over the parties.

13. Upon information and belief, the County does not have governmental immunity against the claims herein.

14. Upon information and belief, the acts of the County described herein are proprietary in nature as opposed to governmental in nature.

15. Upon information and belief, any governmental immunity that the County may have had was waived by the County entering into a contract with EwingCole.

16. Upon information and belief, any governmental immunity that the County may have had was waived by other actions by the County, including but not limited to the purchase of insurance.

17. All conditions precedent to the filing of this action have been performed or have occurred, including, but not limited to, the filing of this action prior to the expiration of any applicable deadlines, statutes of limitations, and/or statutes of repose.

## FACTS COMMON TO ALL COUNTS

18. This civil action concerns the County's refusal to pay long due and owing fees for architectural services provided by EwingCole in the course of a now-terminated project to develop a new state-of-the-art "Crown Event Center" in Fayetteville, North Carolina (the "Project").

19. The County owns and operates the "Crown Complex," a collection of entertainment venues including an arena and theater which, after many years of use, were ageing and in need of major renovations to continue operating and bring them into ADA compliance.

20. In September of 2022, after deciding that it would shutter and replace the existing theater, the County began soliciting qualifications from professional design firms to provide full architectural and engineering services for the development of a new downtown Crown Event Center (the "CEC") with multipurpose performance spaces to host current and future events including concerts, comedy shows, family shows, touring theater / Broadway events, local and regional performances, and local banquet events.

21. Per the County's Request for Qualifications, the new CEC, with an estimated total project budget of $82,500,000, was anticipated to be approximately 89,000 square feet, consisting of spaces with the capacity for events between 2,500 and 3,000 seats and for banquet events between 250 and 500 seats; VIP boxes and membership seating for events; a "grand" lobby entrance; meeting rooms and classrooms; spaces permitting food service for banquets and concessions; dressing rooms; a loading dock; and "back of house" components typical to multipurpose centers.

3

22. On November 28, 2022, EwingCole entered into an agreement with the County to provide architectural, structural, mechanical, electrical and plumbing engineering services for the Project (the "Agreement"). With the express caveat that material changes may occur, Article I ("Initial Information") of the Agreement identifies an estimated construction budget of $65,000,000 and sets forth milestones of December 2022 and January 2024 for the commencement and completion, respectively, of project design; February 2024 for construction commencement; and October 1, 2025, for substantial completion.

23. Section 1.1.8 of the Agreement identifies Jermaine M. Walker, the Director of Engineering and Infrastructure for the County, as the County's representative for the Project.

24. Section 1.1.9 identifies Matthew DeSilver of McDonough Bolyard Peck, Inc. ("MBP") as "[t]he person . . . in addition to the [County's] representative, who [is] required to review the Architect's submittals to the Owner."

25. Essential to the Agreement—a modified AIA B133 Standard Form of Agreement between Owner and Architect, Construction Manager as Constructor Edition—is the County's obligation to retain a Construction Manager at Risk ("Construction Manager" or "CMaR") to be involved throughout the duration of the project. Per Section 3.1.2 of the Agreement, EwingCole was required to "coordinate its services with those provided by the Owner, Construction Manager, and the Owner's consultants" and was "entitled to rely on . . . the accuracy, completeness, and timeliness of, services and information furnished by the Owner, Construction Manager, and the Owner's consultants."

26. The Agreement memorializes the CMaR's role in all phases of EwingCole's services, starting with the Schematic Design Phase governed by Section 3.3. Specifically, the Agreement requires EwingCole to review information provided by the Owner and CMaR

4

(Agreement § 3.3.1), "prepare a preliminary evaluation of the Owner's program, schedule, [and] budget for the Cost of Work" (§ 3.3.2), present that "evaluation to the Owner and Construction Manager" (§ 3.3.3), and then prepare and present (to both the County and CMaR) a preliminary design (§ 3.3.4) before proceeding with the preparation of Schematic Design Documents, again, "for Construction Manager's review" (§ 3.3.5).

27. The Agreement also provides that EwingCole shall be provided with cost estimates prepared by the CMaR at the conclusion of the Schematic Design Phase (§§ 3.3.7, 3.3.8) and during and at the conclusion of the Design Development Phase (§§ 3.4.3, 6.4, 6.5).

28. Section 6.3 of the Agreement states in relevant part that EwingCole "shall be entitled to rely on the accuracy and completeness of estimates of the Cost of the Work the Construction Manager prepares as [EwingCole] progresses with its Basic Services," and further that EwingCole "shall prepare, as an Additional Service, revisions to the Drawings, Specifications or other documents required due to the Construction Manager's inaccuracies or incompleteness in preparing cost estimates, or due to market conditions the Architect could not reasonably anticipate."

29. EwingCole's "entitle[ment] to rely" on cost estimates prepared by the CMaR is reiterated within Section 3.3.8, which requires that EwingCole be provided with a CMaR-prepared cost estimate during the Schematic Design Phase.

30. Article 11 of the Agreement governs EwingCole's compensation, which falls into four categories, namely, payment for: (1) Basic Services; (2) Additional Services; (3) Supplemental Services; and (4) Reimbursable Expenses.

31. For EwingCole's Basic Services, the County agreed to a stipulated sum of $6,414,012 (§ 11.1), which is allocated to each phase of services in percentages as follows:

Programming/Concept Design, five percent (5%); Schematic Design Phase, seventeen percent (17%); Design Development Phase, twenty-one percent (21%); Construction Documents Phase, twenty-nine-and-one-half percent (29.5%); and Construction Administration Phase, twenty-seven-and-one-half percent (27.5%) (§ 11.5).

32. As to the manner and timing of payment to EwingCole, Section 11.10.2.1 of the Agreement provides as follows:

> Unless otherwise agreed, payments for services shall be made monthly in proportion to services performed. Payments are due and payable upon presentation of the Architect's invoice. Amounts unpaid sixty ( 60 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
> *(Insert rate of monthly or annual interest agreed upon.)*
>
> 1.5 % 18% per annum
>
> [§11.10.2.1.]

33. In addition to imposing interest for non-payment, the Agreement expressly prohibits the County from the following:

> withhold[ing] amounts from the Architect's compensation to impose a penalty or liquidated damages on the Architect, or to offset sums requested by or paid to contractors for the cost of changes in the Work, unless the Architect agrees or has been found liable for the amounts in a binding dispute resolution proceeding.
>
> [§11.10.2.2.]

34. Article 4 of the Agreement governs Supplemental and Additional Services by EwingCole. Section 4.2 provides that EwingCole may perform Additional Services "after execution of this Agreement without invalidating the Agreement," which are to be compensated in addition to EwingCole's Basic Services stipulated fee unless the services are "required due to the fault of the Architect."

35. In relevant part, Article 4 continues as follows:

> **4.2.1** Upon recognizing the need to perform the following Additional Services, the Architect shall notify the Owner in writing with reasonable promptness and explain the facts and circumstances giving rise to the need. <u>After such notice, the Architect shall proceed to provide and be compensated for the following Additional Services unless instructed by the Owner in writing not to provide such services</u>:
>
> > **.1** Services necessitated by a change in the Initial Information, previous instructions or recommendations given by the Construction Manager or the Owner, written approvals given by the Owner, or a material change in the Project including size, quality, complexity, the Owner's schedule or budget for Cost of the Work, or bid packages in addition to those listed in Section 1.1.6;
> >
> > **.2** Making revisions in Drawings, Specifications, or other documents (as required pursuant to Section 6.7), when such revisions are required because the Construction Manager's estimate of the Cost of the Work, Guaranteed Maximum Price proposal, or Control Estimate exceeds the Owner's budget, except where such excess is due to changes initiated by the Architect in scope, capacities of basic systems, or the kinds and quality of materials, finishes, or equipment;
> >
> > . . . .
> >
> > **.13** Services necessitated by the Owner's delay in engaging the Construction Manager;
> >
> > **.14** Making revisions to the Drawings, Specifications, and other documents resulting from agreed-upon assumptions and clarifications included in the Guaranteed Maximum Price Amendment or Control Estimate;
> >
> > . . . .
>
> [§ 4.2.1 (emphasis added).]

36. Article 9 governs suspension of the project and termination of the Agreement. Section 9.1 permits EwingCole to suspend its services in the event of nonpayment, providing:

7

4901-1730-7868 v.5
Case 5:25-cv-00665-D-RN    Document 2    Filed 10/14/25    Page 7 of 15

> If the Owner fails to make payments to the Architect in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect's option, cause for suspension of performance of services under this Agreement. If the Architect elects to suspend services for failure by the Owner to make payments, the Architect shall give seven days' written notice to the Owner before suspending services. In the event of a suspension of services, the Owner agrees that the Architect shall have no liability to the Owner or any other entity for delay or damage because of such suspension of services provided such suspension is not due to the Architect's failure to perform. Before resuming services, the Owner shall pay the Architect all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

37. With respect to termination, Section 9.6 provides that if the County "terminates this agreement for its convenience pursuant to Section 9.5," permitting the County to terminate without cause, "the [County] shall compensate the Architect for Services performed prior to termination, Reimbursable Expenses incurred, and costs attributable to termination, including the costs attributable to the Architect's termination of consultant agreements."

38. Following execution of the Agreement, the project was programmed and proceeded through Conceptual Design, which by June of 2023 resulted in a revised program of 131,000 square feet and a revised $107,000,000 construction budget. The revised budget was based on estimates prepared by the County's cost estimator consultant, MBP, and EwingCole's own consultant, Palacio.

39. On July 31, 2023, EwingCole issued a change order ("CO#1") for Additional Services associated with the increase in project scope. CO#1 provided for an increase of $2,010,839 to EwingCole's stipulated fee to compensate EwingCole for the Additional Services.

40. Upon not receiving written notice to refrain from providing services associated with CO#1, EwingCole, consistent with Section 4.2.1 of the Agreement, commenced its provision of Additional Services described within CO#1.

41. The County did not formally sign CO#1 until November 25, 2024, sixteen months after CO#1 was issued.

42. Around August of 2023, MBP and Palacio had arrived at conflicting cost estimates of $110,000,000 (MBP) and $126,800,000 (Palacio). By this point in time, there was still no CMaR under contract to prepare its own cost estimates or participate in reconciling estimates, and the building size had increased to 171,844 square feet due to program requests from the County, including that the loading dock be enclosed for aesthetic reasons.

43. EwingCole reconciled the existing estimates, and MBP and Palacio agreed the project was within budget. After a value engineering effort—at no additional cost to the County—the building was reduced to 164,000 square feet with the enclosed loading dock, and on August 15, 2023, the County's Crown Event Center Committee ("CECC") approved the revised Schematic Design, which was then presented to the full Board of Commissioners on August 21, 2023.

44. On or about September 18, 2023, the CMaR, TA Loving/Metcon, came on board the Project and was provided drawings representing 30% of EwingCole's Design Development services, which the CMaR reviewed to provide its initial cost estimate. While the building had undergone further revisions due to requests by the County, it maintained the approved Schematic Design size.

45. The CMaR's initial estimate, which projected the cost of work at $128,700,000, was not provided until one week prior to EwingCole submitting its complete Design Development drawings and specifications on November 15, 2023. Due to the increased cost in the CMaR's

initial estimate, the design team began a value engineering effort while the Design Development documents were being completed.

46. Around mid-December 2023, the CMaR returned with an estimated construction cost of $136,600,000 based on the completed Design Development documents. Additional value engineering—again, at no additional cost to the County—took place, bringing the construction cost down to $129,400,000.

47. On January 16, 2024, the project was presented to the CECC along with the final Design Development estimate and value engineering budget—with a construction cost of $129,400,000 and total project cost of $155,900,000—and options for meeting the budget.

48. At the meeting, DeSilver represented that the cost increases were due in part to increases in the building program, but also to unprecedented market escalation, particularly related to the structural, mechanical, plumbing and electrical trades. DeSilver stated further that these issues could not be confirmed until TA Loving/Metcon was brought on board as CMaR to confirm pricing and schedule. Lastly, DeSilver stated that EwingCole would be required to undertake a redesign effort.

49. The CECC gave the design team a week to present a project concept that was within a revised budget of approximately $145,000,000 total project cost for a 131,000 square foot building.

50. The revised design and budget were then presented and approved on or about January 23, 2024.

51. On January 25, 2024, MBP sent EwingCole a draft revised budget conforming to the County's approval of a total project cost of approximately $145,000,000. The draft budget included an increased amount of $10,500,000 on the "Architect" line, encompassing EwingCole's

original Basic Services fee, reimbursable expenses, and compensation for Additional Services related both to CO#1 and the approved redesign.

52. On March 4, 2024, EwingCole issued a second change order ("CO#2") to the County with an addition of $1,920,858 to EwingCole's fee, which was reflected in the $10,500,000 total Architect fee in MBP's revised Project budget. CO#2 indicated that to deliver the revised program, EwingCole would need to "essentially start[] over with our Design Development Phase."

53. EwingCole did not receive notice to not proceed with the services associated with CO#2 and therefore continued with the redesign and invoiced the related Additional Services, indicating an increased Design Development fee on invoices submitted to the County.

54. The County fully paid all invoices for Design Development Phase services associated with the redesign memorialized in CO#2.

55. On June 17, 2024, the CECC authorized the Project to move to the Construction Documents Phase.

56. However, the County soon stopped paying EwingCole's invoices, beginning with its July 2024 invoice, and ultimately including the invoices for August, September and October of 2024, and February of 2025. These invoices, which reflect EwingCole's Basic Services fee set forth in the Agreement and compensation provided for by CO#1, have not yet been fully paid.

57. On August 29, 2024, the County emailed EwingCole to confirm that once a revised W-9 contractor certification was received, CO#2 would be formally processed.

58. In November of 2024, after EwingCole completed its Construction Documents Phase services--and well after EwingCole completed and was paid for Design Development Phase services related to the redesign memorialized in CO#2--the County formally approved and executed CO#1 but advised EwingCole for the first time that it considered CO#2 unapproved.

11

59. In an attempt to address any concerns the County had, on February 17, 2025, EwingCole sent the County a detailed, written explanation of the history of CO#2. EwingCole received no response.

60. EwingCole continued to provide Construction Administration Phase services until, on or about March 5, 2025, the County announced a 30-day suspension of the project to allow for an independent third-party assessment of the project's status "to ensure the project's long-term success."

61. On March 17, 2025, having still not received payment on invoices from 2024, EwingCole exercised its rights under Section 9.1 of the Agreement and notified the County that it was formally suspending its services due to non-payment. The following month, the County notified EwingCole that it was lifting its own suspension and was looking forward to resolving EwingCole's claim for unpaid fees. At no point in time has the County ever challenged EwingCole's right to suspend its services or declared EwingCole to be in default of its contractual obligations.

62. On or about June 4, 2025, the County Board of Commissioners voted to discontinue the Project and terminate its contract with EwingCole. In its announcement, the County explained that it was electing to pursue a full renovation and modernization of the existing Crown Complex rather than build a new event center. The Project was formally terminated, along with all contracts, by way of letter dated June 6, 2025.

63. Despite never identifying any issues with EwingCole's performance of its services or alleging that EwingCole did not perform services for which it billed, the County refused to pay EwingCole for Construction Documents Phase and Construction Administration services that the

County approved by way of a valid contract and contract amendment, CO#1, services reflected in invoices for July, August, September and October of 2024 and February 2025.

64. As of September 1, 2025, the total amount due-and-owing was $2,300,473, not including interest.

65. On September 11, 2025, the County issued to EwingCole a payment of $977,615.61 against amounts due-and-owing.

66. The County's $977,615.61 payment represents less than half of the amount that was owed for services performed under the Agreement and CO#1, not including interest.

67. Presently, the total amount due and owing, not including interest, is $1,322,857.39. Interest accrued thus far remains unpaid, and interest continues to accrue on the due-and-owing sum of $1,322,857.39.

68. As of September 25, 2025, the total interest accrued on past or presently due-and-owing amounts is $329,571.55.

69. As of the filing of this Complaint, the County has given no indication that it intends to make further payment to EwingCole.

## COUNT I
## BREACH OF CONTRACT

70. EwingCole incorporates the preceding paragraphs as if fully set forth herein.

71. The Agreement, as amended by CO#1 and CO#2, is a binding and enforceable agreement between EwingCole and the County.

72. The Agreement contains a pre-audit certificate.

73. The unpaid invoices complied with the Agreement as amended by CO#1 and CO#2, and were due and payable upon presentation to the County.

13

74. EwingCole fully, timely, and properly performed its obligations under the Agreement, as amended by CO#1 and CO#2.

75. Any condition precedent to the County's obligations to perform its duties under the Agreement, as amended by CO#1 and CO#2, have been satisfied.

76. The County materially breached the Agreement, including by failing and refusing to fully pay the July, August, September, October 2024 and February 2025 invoices, in material breach of the parties' contract, including Section 11.10.2.1 of the Agreement.

77. By withholding amounts from EwingCole's compensation, the County is in material breach of Section 11.10.2.2 of the Agreement.

78. EwingCole has suffered and continues to suffer significant damages as a direct and proximate result of the County's breaches, including, but not limited to, the expenses and losses consisting of and/or associated with the nonpayment of $1,322,857.39 in compensation that remains due and owing, and nonpayment of interest in the amount of $329,571.55 as of September 25, 2025, accruing at the annual rate of 18%.

WHEREFORE, EwingCole demands that judgment be entered in its favor and against the County in an amount in excess of $75,000, together with interest, costs, and such further relief as the Court deems proper.

## JURY DEMAND

EwingCole requests a trial by jury.

HAMILTON STEPHENS
STEELE + MARTIN, PLLC

*/s/ Carmela E. Mastrianni*
Carmela E. Mastrianni (NC Bar No. 50858)
525 N. Tryon Street, Suite 1400
Charlotte, NC 28202
Telephone: 704-344-1117
Fax: 704-344-1483
cmastrianni@lawhssm.com
*Attorney Plaintiff*

October 14, 2025

15

4901-1739-7868, v. 5   Case 5:25-cv-00665-D-RN   Document 2   Filed 10/14/25   Page 15 of 15